Good morning, Your Honors. May it please the Court, my name is Leif Johnson for the United States. Congratulations, Judge Owen. Thank you. You're welcome. Your Honors, this case is obviously mostly about a tarry stop and whether or not there was reasonable suspicion. But this Court did ask us to address the question of jurisdiction under 3731. We filed a 28J letter expressing or setting out a little case authority on that. I guess our position, just to state it succinctly, is that we think that the certificate in this case is sufficient to confer jurisdiction. There was an exclusion. There was a suppression of evidence. And although some of it might or was held open for sort of later ruling, we think that the weight of authority on that question is that there is still jurisdiction in this Court. And the en banc case in W.R. Grace pretty much settled that from our perspective. Let me understand your position here. Is it that as long as the district court suppressed, let's say, just one single item of evidence, but in the course of the order said I'm going to defer ruling as to the other 25 pieces of evidence, the entire order comes before us and we have jurisdiction to review basically any aspect of that ruling or just the aspect of the ruling that deals with the one item of evidence that was suppressed? I think it comes in with regard to the contingent evidence as well, Your Honor. That's the way I read W.R. Grace and that is the way I read the other circuits, the Fourth Circuit and the Second Circuit. That seems to indicate where they've gone on this question. I think there's good reason for that, Your Honor. I mean, obviously, if the Court holds in this case the gun issue until trial, you know, jeopardy is attached, and that's an important question. So how do you read the judge's, the district judge's order right at the end? What exactly did he, what did he say is suppressed and what is reserved? Not so much reserved, but it looks like he left the government an opportunity through an independent means. Should the government decide to pursue it pre-trial. So what is your understanding of what, right now, if you were to go to trial today, tomorrow, and the exclusion order was in force, what is excluded today? Right now, the contents of the car certainly are excluded. So you have the license plates and you have the cash. I'm sorry. You have the license plates and the cash. That was obviously excluded. And obviously, the Court left open the issue. So only, only what they've recovered or discovered in the car, is that the only thing that's excluded? No. As I read it. Tell us exactly what's excluded right now. The license plates and the cash in the car. Excuse me. And in addition to that, several items, and I'm referring to ER 236, where there are several items that were recovered in the search of the garage. As I read the district court's opinion, it excludes that evidence as well. And so there was evidence of two burglaries that was discovered in the garage, that is, pawn slips and baseball memorabilia and a tool that was found later. Okay. How about any statements from Burton himself? Those were excluded under Miranda, for Miranda reasons, and we conceded that. All right. So those are out. Those are out, yes. All right. So what else? Anything else? No. But the Court doesn't clarify what it means by attenuated evidence. And that's the real difficulty. Number one, we don't think we should have to argue attenuation to get that evidence  But be that as it may, it leaves sort of the question as to whether live testimony is too attenuated, but then there's also the guns, right, because the guns were discovered as a result of the interviews with Trimble, Morgan and Jones. And so that's the difficulty with the posture that the district court has left us with. So let me ask you this. Why the judge did the district judge did leave you an out. Only with respect to that evidence. However, Your Honor, I mean, again. I don't want to, you know, I have no idea what the government strategy is here, but I gather the government might think it might be difficult to meet the showing that the derivative evidence is too attenuated or is not attenuated? It's certainly an argument that's available to us. You know, and the magistrate judge sort of said, well, you can also show by independent source that some of this testimony could come in. Well, independent source, I think we can safely say I don't think we have. Attenuation is another question. But it's actually kind of a complicated facty question. And it's certainly a harder question than whether or not there was reasonable suspicion for the stop, which we don't think is that complicated. So our position is that the district court did leave an opening, but it's a very small opening, and it's fraught with a number of different factual contingencies. And those contingencies are set out in the Supreme Court's decision in Cicilline, and they include, you know, the length of the road of the investigation and the purpose for the stop and whether the purpose for the stop was to get at these witnesses. And we think we meet some of them clearly, but there are some that are not quite so clear. And so I guess our position is that the district court really didn't leave us that much by leaving that morsel at the end of its opinion. But, counsel, you would agree the district court said that it would have that hearing pretrial, correct? It indicated that if we made a pretrial motion, it would take it up, but it did not indicate that it would rule on that prior to jeopardy attaching. That's not actually clear from the order itself. So as you read ER-209, you don't read that as the court saying in a pretrial motion in limine stage it would consider those questions? Well, I would hope it would. I just don't know. I mean, I think if we presented it to the judge in a pretrial ruling and said we would like to talk about attenuation, that he would give us that opportunity prior to jeopardy attaching. I mean, I don't see his order as precluding that. But that is a contingency that I actually can't answer right now. Your position is that that's irrelevant for jurisdictional purposes because we do have an order that suppresses some evidence.  And I think WR Grace basically says that. And we have enough evidence to tie us into the use of that stolen credit card. And it's fairly important evidence for that purpose. I mean, the license plates show that the Bronco and the pickup were there at the same time, and that shows that whoever owned the black pickup and the Bronco were associated, and that tends to show more that it was Burton who was using the stolen credit card. All right. Maybe you can tell us about reasonable suspicion. All right. So if we move to reasonable suspicion, we think the error in the lower court here was really one that's not at all uncommon in these kinds of cases. It's, you know, the forest for the trees, isolating, you know, particular factors and giving them an innocent cast. And, you know, if you read the district court's decision or actually the magistrate's findings on this, the magistrate, you know, sets out that anybody could have been driving the car, the call could have come from anywhere, that, you know, these various circumstances do have an innocent cast. And that's the nature of pulling out circumstances. As this Court has held in Onbunk, in the Valdez-Vega case, you know, the district court should take a more holistic view. It should take a view of the totality of those circumstances. And we believe that fair inferences from those circumstances weren't made. When you consider and you just step back and ask yourself, as just an ordinary person, you know, if you knew that this is a person who used a stolen credit card and he's associated with that truck and, you know, the officer goes to his house, they find that truck and it links to Burton and that's his house, and he goes in and he talks to a person to ask for Burton and he's not there and his wife is and she says, you know, he's out doing errands and he leaves his card and asks her to ask him to call when he returns. And that's important here because then Officer Weiss goes back and does some research and he learns that Burton is, in fact, on probation for burglary. He learns that he's done some roofing and that one of the burglar victims owns a roofing company, so there's possible connections there. And all these circumstances are coming together just very quickly. And in that very quick span of time, a white car drives up, pulls in and parks right at Burton's house. And a guy gets out and he goes and the record seems to indicate that he goes in through the back door. And shortly after that, a call comes through to dispatch that this person, Burton, is calling for Weiss. And then shortly after they take a message, this person comes out of the house and leaves. Those circumstances all taken together, if you were to ask any ordinary person on the street, they would say, that's probably Burton, and that's enough to meet the reasonable suspicion standard. It is. Can I ask you just to go way back to the very beginning? Okay. I wasn't clear on this from the record. So that truck in the driveway seems to be the key thing that links Burton to the criminal activity, right? It is. Yes. And go ahead. And, well, I would add that, of course, the license plates and its association with the Bronco are important. Okay. That's what I'm trying to figure out. That's later. That happens later, though, right? Yeah, that's in the car. So I'm talking about we're just sitting there, we see, oh, hey, that's the truck. That's the truck. How do we know that truck is linked to the criminal activity? Okay. So there's video from several businesses where the stolen credit card is used, and that truck shows up in all of them. Well, that's what I'm saying. How do we know it's that truck? And it's distinct because it has – it's a late model black Ford pickup truck with this toolbox on the back, and it has a distinctive sort of late model look to it. And when the – There's not a whole lot of black pickup trucks in your neck of the woods? Well, there are, but it is a late model pickup that's set up in a particular way, right? And so it's pretty obvious that they've found it. And, in fact, some of the burglaries were in the neighborhood where they found this pickup, right? I mean, there's – the Green Meadow market is where the credit card is used, and one of the burglaries happens on Green Meadow. I think the record indicates that on page 236. So there's some association there as well. But so they locate this pickup, comes up to Burton, and, of course, that gets things rolling because he's on probation for burglary, and then things really start to fit together. And to be honest, the lower court really didn't question the sort of did we find the right pickup. And that question was asked by, I think, both of the deputies involved, and they were like, no, that was the pickup. They were very clear on that. So if we get to the pickup and if we get to all of these circumstances, we just don't think there is any other reasonable conclusion from this record. If you look at the fact that this isn't a probable cause of termination, it's a minimal level of objective justification. And we think that that's present in an objective sense. In this situation here, would you agree that this was a completed crime, in the sense that the deputies did not have reasonable suspicion that the driver of that car had drugs in the car or was transporting aliens throughout the state, correct? True. So under the completed crime analysis of Hensley, you cited Hensley in your brief. Yes. Do you know of any authority that would prohibit this court from looking at whether there were alternative means to stopping the car to assess the identity of the driver? Well, I think the court could look at sort of the ñ what I think Hensley teaches us is that you have to look at sort of the importance of the governmental interest in making the stop here. And I think that was very high here. I mean, we have sort of an exigent circumstance in the sense that we have a number of unsolved burglaries, we have an armed robbery, and we have a suspect who's starting to crop up in all of these, and we have the fact that he's driven away from the house after he knows the police are looking for him. But he didn't call. He didn't call. That's right. But he also left. And so he's sort of leaving the scene and given all of those factors that I think it was only reasonable under that circumstance to make the stop for the minimal intrusive effect of identifying the defendant. But to ask my question a different way, there's a case from the Ninth Circuit called Grigg in which the court looked at alternative means as a different way to look at it. Yes. Can we look at alternative means? Do you know of any authority that would prevent this court from saying, look, the officers could have run the license plate, they could have had his photograph, they could have talked to his probation officer? I do think you can. And I think that, look, that sort of enters into the inevitability doctrine here. You know, sort of, well, what would have happened logically? They would have run the license plate. In fact, what probably would have happened if Weiss hadn't made the mistake about whether he thought Burton had been positively identified, what probably would have happened is they would have followed him for another couple of blocks, taken down the license plate and called it in, and then that car would have come back to Burton and his wife. And I see I'm almost out of time. I'll give you a minute for rebuttal. Thank you. There are other issues, but if the Court has no other questions, I'll. Thank you. Thank you. Good morning, Your Honors. My name is Palmer Huvestal. I'm from Helena, Montana. And it's an honor to appear before Your Honors first day. Thank you. I look forward to many other oral arguments here. Thank you. So I think the initial question under the Grace inquiry is whether the certification of the United States attorney was proper. Clearly under Grace at page 507, if the merits of the appeal independently require the Court to question whether the evidence is truly material, then the government's certification is not conclusive. And so I would initially point to the United States attorney certification. And the United States attorney basically states that sufficient evidence, substantial proof of a material fact has been suppressed. And that includes, you know, the guns, the license plates, cash, statements made by the defendant, witness. And then he says likely includes two additional witnesses. Then on page 3 of the certification, he states that as a result of the suppression order, the government is unable to prove any count of the indictment. And I think that that statement there is what comes under scrutiny here, because if we take a look at the other end. First, if we take a look at the charges, counts 1 and 2 are gun counts, felony possession of a firearm. We're not talking about credit cards. We're not talking about these burglaries. We're talking about the means by which the firearms were recovered. And so the suppression order is, I think, is material as to counts 1 and 2, but counts 3 and 4 are the Bowser burglary and whether the defendant used a gun or a firearm in this Bowser burglary. And I would point the Court to ER-258, which is Defendant's Exhibit 7A, where they identify surveillance videos from two of the store videos where he used the stolen credit card. They identify at page, or ER-259, Burton in a blackboard pickup from the video surveillance. And then ER-260, he takes that video. And this is Dave's Exxon, where Burton goes in later and uses one of the credit cards to buy cigarettes and whatever. But importantly, there's a picture of him there with a hooded sweatshirt that has a specific design on it. And Detective Peterson later on says, I also viewed photos of the same video. That's the video of the robbery, count 3. And later observed that the male at the robbery, male in the video at the robbery, was wearing the same jacket with the white emblem as Burton. So in order to prove whether Burton actually committed this offense in count 3, they have the video. They have these videos that have a completely entirely separate from. Well, that doesn't mean that the evidence they're seeking, you know, to be able to utilize at trial is the subject of the suppression order, is not material. That's correct. But I think when you question it. I mean, they brought the prosecution to put their strongest, put on their strongest case, and this evidence is clearly material to that, you know, to their case. But I think it goes to the United States attorney's certification. He says that without this evidence, we can't prove counts 2 or 3 and 4. But that's not what the statute, that's not what the statute requires. The statute requires a certification that it's substantial proof of a fact material in the proceeding. I don't know. Isn't that enough if the Attorney General certifies to that? Well, I think that the Court under Grace, it left open that, the en banc court left open the possibility that the Court could, if necessary, in reaching the elements of materiality or certification or the appropriateness of the certification, go to the merits. All I'm saying is that materiality isn't the same as we can't prove a count without this evidence, right? Yeah. I understand that, and I agree with the Court. But if we go to the plain language of the United States attorney, there is other substantially strong evidence that they can use to prove counts 3 and 4. So under the district judge's order, I think that the license plates are out. I think that the Bronco is out. The cash is out. Trimble's identification is out. Trimble then subsequently talks about the guns, and so they find the guns. The guns are out. The two additional witnesses are out. In the government certification, the United States attorney says that it's likely And, of course, as the Court has pointed out, we can litigate before the district court whether those other witnesses might be testifying. And so, you know, the evidence is they would certainly like to have that evidence at trial, but I think that they also have other alternative evidence that is not linked to the unlawful conduct, not linked to the stop, not linked to the statements made to the probation officer that they can use to prove the elements of the crime. Well, counsel, let me ask you this. There are two, I'll say, separate suppression issues in this case. There's the stop, and then there's the questioning. Yes, Your Honor. Is it your argument today that the stop, let's assume we were to agree with the district court and say the stop was bad. How far does that go? Does that knock out everything, all the government's evidence in the case in terms of, let me rephrase it this way. How far does that go in terms of excluding evidence? Do we need to reach, from your perspective, do we need to reach the Miranda-Pattain issue if we were to uphold the district court's ruling that the stop was not proper? Well, arguably, Mr. Burton would not have, at least at that point, discussed Mr. Trimble. But for the stop. So possibly. Possibly the Trimble evidence, the Rodney Trimble evidence, which leads to the guns, which leads to Joe Morgan and Corey Jones, just on the basis of the stop. But I think the second basis is, I think the Court, excuse me, pointed out, the second basis is an issue that the government has conceded. Clearly, Mr. Chvilicek clearly violated Edwards. And so on that basis alone, Trimble, then the guns, then the other evidence, the two other fellows go out. They're out, too. And so from our perspective, the district court's analysis was right on. The point is that they simply had no evidence whatsoever linking the driver of the white sedan to the pickup. They had no idea who the driver of the white sedan was. The white sedan was not, didn't have anything whatsoever to do with this investigation. And I think that Mr. Johnson is correct. What they should have done is continued to follow him for a few more blocks, ran his But as it was, they saw some guy driving up to this house in a white car, and he walked in and he walked out, and they stopped him without having any idea whatsoever who it was. Well, if that's all that they had, I'd agree with you. But the phone call and the timing of all this, I mean, that casts everything in a totally different light, doesn't it? Well, the phone call could have been made anywhere, from anywhere, as the district court and the magistrate judge pointed out. Today, cell phones, as he stated, are ubiquitous. Simply because somebody might happen to enter into a vehicle or into a resident, and then the phone call happens. I know, but it's the timing, I guess, that it seems to me substantially weakens your argument. And just let me tell you what my conception of the fact is, and then you tell me if I've got something wrong here. The one deputy, is it Weiss who goes up to Mr. Burton's wife and hands the card? Yes.  So that happens at, you know, time A. Isn't it, like, an hour or two later before the white car pulls into the driveway and the person goes in the house? I mean, there's a long delay. Yeah. I don't know if the record actually indicates how long of a delay is. What we do know is that he went back to his office and he did some research. So I think it's reasonable. Okay. But my point is that if, in fact, Mr. Burton were out and about running his errands and his wife had alerted him to the fact that the officers were interested in talking Presumably she would have called him, oh, my God, I got this car. I better call my husband and let him know. And the call would have happened soon, right? As it stands, at least, again, as I understand the record, there's a good deal of delay before whoever, I guess, Mr. Burton calls the dispatch. And so, I mean, and it's in that exact 5 to 15 minute or so window when he's in the house that the call is made. It just seems like those two things together. I mean, of course, it doesn't prove to a certainty that the person who walked in the house is Mr. Burton. But that certainly makes it a lot more of a powerful case from the government's standpoint, doesn't it? Sure. But there's nothing that takes it beyond the possibility that it might be just mere coincidence, I don't think. And the reality is that that really did not enter into their analysis, because as all three of these deputies stated, they still didn't have any idea who it was that they stopped. I know. But it's an objective. It's a totally objective determination. It doesn't matter what subjectively was going through their heads. We just look at the facts. And, I mean, you're right. It could have been a coincidence that he just happened to call during that narrow window when, you know, he had presumably the person in the house had contact with the wife and was alerted to the fact that, hey, you need to call this person. But, I mean, that's not the standard. Maybe if we were arguing about probable cause, but we're even a notch below that. Right? Well, I think it would have been a simple prospect for law enforcement. I mean, it would have been a simple prospect for them to continue to follow this vehicle or, as the Court pointed out, just wait for him to call back or call him again, return his call. That would have been simple. But the fact that they didn't know who it was, the fact that they realistically just stopped somebody who came out of the house that had no tie to Burton, that had no tie to the vehicle or to the pickup, I think it just doesn't pass what's required by the Fourth Amendment. And the Fourth Amendment, again, requires the bulwark is reasonableness. And it was unreasonable for them to stop somebody that they didn't know who it was and that had no tie to the illegal conduct. So that's our position. And we think that the magistrate judge and the district judge were right on in their analysis. What do you have to say on the whether the Fruits analysis applies to an Edwards violation? I guess I thought the case law steered heavily in the government's favor. What do you have to say on that? Well, I think that the district court's analysis with respect to Tucker, Patan, and I think the third case escapes me right now. But in those cases, the defendant did not ask for counsel. And here, the defendant expressly did ask for counsel. And we have Mr. Chvilicek saying, all right, go ahead and issue the Moran rights because I want to get him to say something. And he knew. I don't quite get the logic of that. No. But I think that it shows his intent. I think it shows his intent to go beyond what was permissible under the probation search that he clearly did. By the way, I looked in the record. Was the probation term, the document that embodies the terms and conditions of probation, were they in the record? I don't think that they were ever read into the record. But in my recollection, when I did the suppression hearing, is that somebody talked about them. But the judgment and the conditions of probation were never entered into the record. And I think that maybe the magistrate judge might have asked somebody about it. I'd have to go back and review the record. Was the probation officer relying on the conditions of probation as a basis for questioning  I don't think so. Because he could, as he admitted, talk about employment. And he could talk about, you know, drug use and those sorts of things. To talk about simply what happened to the bronco goes beyond terms of employment. It goes beyond drug use. It goes beyond other things that the probation officer would have normally and reasonably questioned him about. I recall your client was taken into custody on the probation violation. Yes. Is he still in custody on that? Yes, he is, Your Honor. I think he was charged at the State level as well. And he is awaiting trial on separate charges. Okay. Anything else? No, Your Honor. Thank you. Okay. Thank you. Well, we have a minute for rebuttal. Very briefly, Your Honor, just to get back to your question, Judge Paez. On the issue of Vilacek's questioning, I think it came up in relation to his discovery of the cash. And so he doesn't really say in his testimony that that's what he was doing, that he was questioning related to probation conditions. But I think there's at least an inference that he was. But we didn't raise that issue on appeal. We decided to concede the whole problem. To address your question earlier, Judge Owen, I see this case as taking one of two paths. I mean, if we have a Fourth Amendment violation, then we need to talk about whether attenuation and independent source and inevitable discovery apply. And that runs all the way out to the guns that are later found through the witnesses and Trimble. And the second path is if, in fact, this was a reasonable stop, then I think the question is still in play here as to whether or not derivative evidence of the Miranda violation ought to be suppressed, which it was under the magistrate's findings, which was adopted. So that is an important question. And we think that this Court has at least gone some way towards reaching that conclusion in the past. And we think the weight of authority from the other circuits, and particularly in Tucker and Patain, really do establish that what we conceded is sort of the exclusion here, which is the testimony of Burton in response to those questions. If the Court has no further questions, thank you. Thank you very much. We appreciate your arguments. Very interesting case. And the matter is submitted at this time.
judges: PAEZ, WATFORD, OWENS